IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| JOSEPH LOPEZ, | ) | |
| | ) | |
| Plaintiff, | ) | Judge Bucklo |
| | ) | |
| v. | ) | 01 C 1823 |
| | ) | |
| CITY OF CHICAGO, et al. | ) | |
| | ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |

**PLAINTIFF'S REPLY MEMORANDUM
IN SUPPORT OF SECTION 1988 FEE PETITION**

Arthur Loevy
Jon Loevy
Michael Kanovitz
Russell Ainsworth
LOEVY & LOEVY
312 North May
Suite 100
Chicago, Illinois 60607
(312) 243-5900

**TABLE OF CONTENTS**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.    The Hours Sought Are Reasonable, And Should Be
      Approved . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      A.    There Can Be No Legitimate Dispute That Plaintiff
            Is The Prevailing Party Justifying The Fee Petition . . . . . . . . . . . . . . . . . . . . . . . . . 2

      B.    Defendants' Argument About The Entry Of
            Judgment Is Frivolous . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      C.    Defendants' Attempt To Artificially "Cap" Plaintiff's
            Fees In Proportion To The Financial Result Is Contrary To
            Well-Settled Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      D.    Also Misplaced Are Defendants' Objections To Time Spent
            On Each Little Battle Plaintiff Lost Along The Way
            To Victory . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      E.    This Was Not A "Partial Success" Case, And No Cut In
            Hours Can Be Justified On That Basis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

      F.    The Hours Plaintiff Spent Proving The Policy Claim
            Is Fully Compensable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

            1.    After The Disputed Discovery Was Already Completed
                  By Plaintiff's Counsel, The City Stipulated To Monell
                  Liability By Affirmatively Waving The Need To Prove
                  A Policy And Practice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

            2.    The Record Confirms That The So-Called "Monell-Waiver"
                  Was Proposed By The City And Accepted By The
                  District Court *After* Plaintiff Expended The Attorneys'
                  Fees To Prove The Monell Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

            3.    Plaintiff Won The Monell Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

            4.    The City Cannot Escape Its Obligation To Pay By Trying
                  To Recast The Policy Discovery as Class Action Time . . . . . . . . . . . . . 19

i

G. Defendants' Efficiency Objections Should All Be Rejected . . . . . . . . . . . . . . . 20

  1. Other Courts Have Overwhelmingly Rejected
   These Sorts Of Objections To Loevy & Loevy
   Fee Petitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

  2. Plaintiff's Time Should Not Be Cut For Purportedly
   Duplicative Efforts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

  3. Defendants' Objections About Purportedly Non-Legal
   Work Should Be Rejected . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

  4. Purportedly "Excessive, Unreasonable, Unnecessary
   Work" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

  5. Defendants' Proposed 10% Reduction For Plaintiff's
   Billing Practices Must Be Rejected . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

II. Plaintiff's Counsels' Hourly Rates Should Be Approved . . . . . . . . . . . . . . . . . . . . . 27

 A. Plaintiff's Counsel's Rates Have Recently Been Adjudicated . . . . . . . . . . . . . 27

 B. Defendants' Objections Are Unavailing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

  1. Jon Loevy's Rate of $365/Hour Has Been
   Justified And Should Be Awarded . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

  2. Michael Kanovitz's Rate of $350/Hour Has
   Been Justified And Should Be Awarded . . . . . . . . . . . . . . . . . . . . . . . . 33

  3. Arthur Loevy's Rate of $450/Hour Has Been
   Justified And Should Be Awarded . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

  4. Mark Reyes' Rate of $345/Hour Has Been
   Justified And Should Be Awarded . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

  5. The L&L Associates Rates (Rosenblatt,
   Antholt, and Ainsworth) Have Been
   Justified And Should Be Approved . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

  6. Kurt Feuer's Rates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

  7. Paralegal Rates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

III.    With Limited Exceptions, Plaintiff's Costs Should Be Approved .................. 37

        A.      The City Is Judicially Estopped From Challenging The
                Sufficiency Of The Explanation For The Necessity Of
                Adequately-Documented Expenses ..................................... 37

        B.      Plaintiff's Descriptions Are Sufficient .................................. 38

CONCLUSION .................................................................. 38

iii

## Introduction

Defendants' Response tries to frame the question before the Court in terms of how many billable hours a paying client would pay for in a case like this. There is a conspicuously obvious answer: at least 4,000. That is the number of non-class action hours defense counsels' own client billed in this very same case, not even counting the unaccounted for hundreds of additional in-house hours. Every last one of defense counsels' hours was compensated by their client, the City, to defend this important case over the past six years -- all without any indication that their client felt obliged to impose the sorts of fiscal limitations that Defendants now seek to impose on Plaintiff.

Compared to the defense total, Plaintiffs' counsel's 2,500 hours spent winning the case is hardly "unreasonable." If anything, the enormous disparity illustrates the overall efficiency on the part of Plaintiff compared to the defense.

Moreover, Plaintiff's counsel achieved an outstanding result for their client in a case in which the City insisted right through the appeal that the claim was frivolous, and that any damages were nominal at best. And the defense does not, and cannot, deny that the degree of success in a civil rights case is not measured in solely monetary terms. To a truly unusual degree, Plaintiff's counsels' work in this case exposed and then proved a serious and unconstitutional flaw in the manner in which the CPD treated tens of thousands of arrestees. Debates about "voluntariness" aside (Defendants' Buckhannon argument is defeated below), nothing the City says changes the fact that Plaintiff's counsel obtained an extraordinary victory in the Seventh Circuit, making new law in winning an unequivocal declaration in effect that the City's long-standing policy and practice was unconstitutional.

What is more, Defendants' suggestion that the financial recovery entails some sort of limit on the recoverable fees is contrary to the Supreme Court's teaching. Under very clear precedent discussed below, Section 1988 contains no "proportionality" requirement; to the contrary, Hensley and the cases that follow all hold that courts are not to impose artificial caps on the number of hours attorneys can reasonably spend in pursuing important civil rights claims

where, as here, the total possible monetary gain is somewhat limited relative to the importance of the constitutional rights at stake.

In the end, the lodestar case law establishes a strong presumption that the reasonable number of hours spent should be awarded unless there is a good reason otherwise. Nothing in Defendants' Response justifies a downward departure. Dunning v. Simmons Airlines, Inc., 62 F.3d 863, 873 (7th Cir. 1995) ("A strong presumption that the lodestar figure. . . represents a reasonable fee is wholly consistent with the rationale behind [§1988]").

## I.      The Hours Sought Are Reasonable, And Should Be Approved

Consistent with the manner they have litigated over the past six years, Defendants wage an all-out, line-by-line attack against more than half of the time billed by Plaintiff's counsel. Defense counsel does so notwithstanding: (a) the City entered a settlement agreement by which it affirmatively agreed to pay Plaintiff's reasonable fees as a condition of avoiding a second trial; (b) defense counsel outbilled Plaintiff's counsel almost three hours for every two billed by Plaintiff in this litigation; (c) defense counsel was paid by their client for every one of those hours billed; and (d) Defendants have refused to provide any in-house time records to enable comparison of relative billing practices (*e.g.,* purported inefficiencies).

Defendants have attached to their Response an entry-by-entry objection to Plaintiff's time sheets. Attached to this Reply as Exhibit 1[1] is an entry-by-entry rebuttal to Defendants' objections. The legal argument supporting Plaintiff's position on the various objections is discussed as follows.

### A.      There Can Be No Legitimate Dispute That Plaintiff Is The Prevailing Party Justifying The Fee Petition

For six long years of litigation, the City insisted not only that its treatment of Mr. Lopez was not unconstitutional, but that even assuming it was, only nominal damages were appropriate. The City had a huge incentive to prevail with its positions: as Plaintiff proved notwithstanding

---

[1] All of the *numbered* exhibits are contained in Plaintiff's compendium of reply exhibits. Wherever *letter* exhibits are referenced in this Reply brief, the reference is to the exhibits accompanying Plaintiff's original Petition.

the City's strenuous denials, Mr. Lopez' treatment was consistent with the City's longstanding policies and practices for detaining and interrogating arrestees. Accordingly, the City fought very hard -- enlisting the help of two very expensive and aggressive outside law firms, Jones Day and Ancel Glink -- to try to prove either point.

Although the defense initially persuaded Judge Der-Yeghiayan to adopt a position the City later disavowed, there is no longer any doubt about who won this case. Most obvious is the $50,000 recovery, a life-changing amount for Mr. Lopez, plus the right to pursue hundreds of thousands of dollars (even by the City's estimation) in attorneys' fees. See Robinson v. City of Harvey, 489 F.3d 864, 872 (7th Cir. 2007) ("we do not agree that the degree of Robinson's success in the litigation required the district court judge to lower the fee award" notwithstanding that plaintiff won only $25,000 in compensatory damages and a punitive award that, albeit significantly larger, Ancel Glink argued was uncollectible).

Financial considerations aside, there also can be no dispute that Plaintiff's counsel made new law. Fritcher v. Health Care Service Corp., 301 F.3d 811, 819 (7th Cir. 2002) (whether "new law was made" is a factor in assessing fee petitions). The Seventh Circuit's opinion is a landmark decision, reminding the City that its purported explanations in this case (essentially, the need for further investigation) were insufficient as a legal matter to hold arrestees beyond 48-hours without access to a judge. Lopez v. City of Chicago, 464 F.3d 711, 716 (7th Cir. 2006). The Seventh Circuit also held that the Fourth Amendment, rather than the Fourteenth Amendment, governs such claims, and it soundly rejected the City's contention that nominal damages are that all that should be allowed. Id.[2]

---

[2] If there were any question that new law was made, attached as Exhibit 3 to this Reply is a brief recently filed by the City in another case taking the position that the Lopez decision worked a dramatic shift in the law surrounding conditions of confinement cases. To quote the City, the Lopez decision "clarified the application of the Fourth Amendment reasonableness standard," and any argument that "this was well-settled law in the Seventh Circuit prior to Lopez is wrong." Exhibit 3 at 2. Compare Spanish Action Comm. of Chicago v. City of Chicago, 811 F.2d 1129, 1136 (7th Cir. 1987) (fact that a case was straightforward and raised no novel issues affects the reasonableness assessment).

Were there any lingering doubt about Plaintiff's success, all of Plaintiff's counsels' work in this important case caused the CPD to revamp its policies and practices with respect to arrestees. Defendants do not dispute the conclusion in Plaintiff's Petition that this policy change not only benefits the CPD, but also protects the rights of thousands of arrestees every year.

Crucially, Defendants also do not deny the cause and effect between this litigation and the resulting reforms, arguing instead that the "voluntary" change is irrelevant to the attorneys' fees question under Buckhannon. Defendants misunderstand the law.

The Buckhannon decision holds that a defendant's voluntary undertaking is itself insufficient to bestow prevailing party status, but Buckhannon says nothing about whether the defendant's voluntary changes should be considered by the Court in assessing the fee petition of a prevailing party. Put another way, where, as here, there is no legitimate dispute that the Plaintiff is the prevailing party (and Plaintiff thus does not need to rely on the voluntary change to qualify) then nothing about Buckhannon suggests that the Court could or should ignore the salutary policy change occasioned by the litigation in assessing the fee request. Cf. Benton v. Oregon Student Assist. Comm'n, 421 F.3d 901, 907 (9th Cir. 2005) ("Buckhannon did not address the issue of the factors to be applied in determining the reasonableness of an attorney's fee award to a *prevailing party*. Moreover, nothing in Buckhannon suggests that, in assessing the success of a nominal damages plaintiff for purposes of determining the reasonableness of a fee award, a district court cannot consider the factors set forth in [Farrar]") (emphasis added). Rather, the Supreme Court has long recognized that success in civil rights cases cannot be measured in economic terms alone (see *infra,* Section I.C) and Buckhannon certainly does not purport to overrule that principle.[3]

---

[3] Finally, Plaintiff notes that the Lopez decision is tantamount to a successful injunction. This is because the Seventh Circuit's "holding that the General Order was unconstitutional [serves] as *res judicata* in any subsequent action" for damages arising out of the same policy and practice. See Robinson v. City of Chicago, 868 F.2d 959, 968 (7th Cir. 1989) (even if plaintiffs were unable to file a case while in custody in order to secure standing, a judgment for damages serves as the functional equivalent of an injunction).

**B.    Defendants' Argument About The Entry Of Judgment Is Frivolous**

Defendants concede, as they must, that the Seventh Circuit ordered that judgment should have been entered in Lopez' favor.  Lopez, 464 F.3d at 722 ("We remand this case to the district court for entry of judgment for Lopez on his duration of confinement claim. . .").

On remand, this Court ordered a settlement conference with Judge Brown.  Though the Court was not present for the negotiations, Defendants' Response does not dispute Plaintiff's summary that he made a settlement offer of $50,000 plus the right to seek attorneys' fees, and the City accepted.

In a bit of "revisionist history," Defendants now try to suggest that there is supposedly ambiguity about who prevailed because the Seventh Circuit's instruction to enter judgment never had to be carried out.  This assertion is ridiculous.

On remand, Plaintiff was free to proceed to trial at which Defendants' hands would be tied.  The appellate court already decided that Defendants' actions violated the constitution, and the only question left would be to award damages for starving and depriving a teenager of sleep for four days, all in coercing him to confess to a murder that everyone now concedes he did not commit.  The question of liability having already been resolved in Plaintiff's favor, trial would have been "shooting fish in a barrel" with the only issue left being how much compensatory and punitive damages were appropriate.

If Plaintiff's counsel were truly interested in "running up the meter," they would have proceeded to trial and gotten paid by the hour to try a case that they had already won before it even started.  Instead, Plaintiff's counsel properly assessed their client's interests and demanded $50,000 plus reasonable attorneys' fees as an appropriate measure of damages.  After insisting for six years that this was a nuisance case, the City ultimately capitulated, meeting Plaintiff's demand without even attempting to counter.

Having expressly agreed to pay Plaintiff's reasonable attorneys' fees as part of the deal, the City now turns around and suggests that Plaintiff's counsel made some sort of strategic blunder by not slogging forward with a second trial to judgment.  Defendants' approach (which,

5

as a practical matter, would kill any incentive for settlement) cannot be rewarded. As a legal matter, the procedural reality that the Seventh Circuit directed that judgment be entered (see Lopez, 464 F.3d at 722: "We remand this case to the district court for entry of judgment for Lopez on his duration of confinement claim. . .") rather than actually entering judgment is a distinction without a difference.

This Court has observed that "a party prevails for purposes of [Section] 1988 if it succeeds on a 'significant issue in the litigation which achieves some of the benefits the plaintiffs sought in bringing suit.'" Krislov v. Rednour, 97 F.Supp.2d 862 (N.D. Ill. 2000), quoting Zabkowicz v. West Bend Co., 789 F.2d 540, 548 (7th Cir. 1986). Indeed, Defendants' own Response concedes (at 6), that a judgment *per se* is not required, but rather "comparable relief through a consent decree or settlement." Farrar v. Hobby, 506 U.S. 103, 111 (1992). The Seventh Circuit's Lopez opinion, finding for Plaintiff on liability, is precisely that.[4]

At the end of the day, notwithstanding the vigorousness of the million dollar-plus defense put on by the City to defend the propriety of its practices, Plaintiff won. The Seventh Circuit expressly said so loud and clear, as did the City's agreement to avoid a second trial by obligating itself to pay an amount approaching a million dollars, should the Court deem reasonable anything close to the fees the City paid its own attorneys.

### C. Defendants' Attempt To Artificially "Cap" Plaintiff's Fees In Proportion To The Financial Result Is Contrary To Well-Settled Law

Relying heavily on an out-of-circuit case, Defendants contend that it would be irrational for a "paying client" to spend hundreds of thousands in attorneys' fees to achieve an award that is only a proportion of that amount. This argument cannot be reconciled with well-settled Seventh

---

[4] For support of its position, Defendants' motion argues that the parties' Joint Fee Statement indicates the fee petition "will be based on a settlement, and not on a judgment." Def. Resp. at 7 n.3. Defendants, however, have misquoted the Joint Fee Statement by omitting -- without ellipses -- the last five words in the sentence. What it actually says (tracking the Court's form Local Rule Appendix) is that the fee motion "will be based on a settlement, and not on a judgment *which Defendants intend to appeal.*" See Exhibit B (emphasis added on the language omitted by the defense). Saying that the motion is not based on a judgment that is going to be appealed is not the same thing as saying it is not based on a judgment at all.

6

Circuit case law. In our Circuit, there has long been no proportionality requirement to Section 1988. See Grosvenor v. Brienen, 801 F.2d 944, 946 (7th Cir. 1986) ("The Supreme Court has rejected the proposition that fee awards under §1988 should necessarily be proportionate to the amount of damages a civil rights plaintiff actually recovers because such a rule 'would seriously undermine Congress' purpose in enacting §1988'") (citations omitted); Dunning v. Simmons Airlines, Inc., 62 F.3d 863 (7th Cir. 1995) ("In determining the reasonableness of attorney's fees, this court has rejected the notion that the fees must be calculated proportionally to damages. . . As we understand §1988's provision for allowing a 'reasonable attorney's fee,' it contemplates reasonable compensation, in light of all of the circumstances, for the time and effort expended by the attorney for the prevailing plaintiff, no more and no less"); Littlefield v. McGuffey, 954 F.2d 1337, 1350-51 (7th Cir. 1992) ("The size of the damage award, however, is not the gauge of a plaintiff's victory").

The reason behind this decoupling -- and the reason Defendants' overreliance on the analogy to private sector cases fails -- is that civil rights cases cannot be measured solely in monetary terms. County of Riverside v. Rivera, 477 U.S. 561, 574-81 (1986) ("Congress recognized that private-sector fee arrangements were inadequate to ensure sufficiently vigorous enforcement of civil rights. In order to ensure that lawyers would be willing to represent persons with legitimate civil rights grievances, Congress determined that it would be necessary to compensate lawyers for *all time* reasonably expended on a case."); Grosvenor, 801 F.2d at 946 ("Society as a whole profits from the vindication of civil rights even if a claim, no matter how meritorious, is a losing proposition economically for the aggrieved individual"). The Supreme Court explained as follows:

> Unlike most private tort litigants, a civil rights Plaintiff seeks to vindicate important civil and constitutional rights that cannot be valued solely in monetary terms. And Congress has determined that the public as a whole has an interest in the vindication of the rights conferred by the statutes enumerated in §1988, over and above the value of a civil rights remedy to a particular plaintiff. Regardless of the form of relief he actually obtains, a successful civil rights plaintiff often secures important social benefits that are not reflected in nominal or relatively small damage awards. . . In addition, the damages a plaintiff recovers contributes significantly to the deterrence of civil rights violations in the future. This deterrent effect is particularly evident in the area of individual police misconduct. . .

7

Id. at 574-81 ("A rule of proportionality would make it difficult, if not impossible, for individuals

with meritorious civil rights claims but relatively small potential damages to obtain redress from

the courts. This is totally inconsistent with Congress' purpose in enacting §1988.").[5] Moreover,

all of this remains good law, most recently having been reaffirmed by the Seventh Circuit in

Robinson v. City of Harvey, 489 F.3d 864, 872 (7th Cir. 2007). In fact, Robinson rejected the

same sort of proportionality argument brought by the same defense counsel who try again in this

case.

    Against this backdrop, "it is not uncommon for attorneys' fees awards to substantially

outstrip damages' awards in constitutional cases." Pesek v. Donahue, 04 C 4525, 2006 WL

1049969, *12 (N.D. Ill. Feb. 9, 2006); Garner v. Wade, 97 C 4118, 1998 WL 474137, *3-*4

(N.D. Ill. Aug. 6, 1998) (Castillo, J.) ("Courts do not fixate on the amount of recovery because

the rights vindicated in § 1983 cases often are not pecuniary in nature"). In Ustrak v. Fairman,

851 F.2d 983 (7th Cir. 1988), for example, the Seventh Circuit explained:

> It might seem that a fee *21 times as great* as the damages that the plaintiff obtained (a
> mere $1,001, remember) must be excessive in relation to results obtained, necessitating a
> further discount. But the value of Ustrak's victory cannot be gauged by the modest size of
> the damages awarded. A judicial decision that finds a violation of constitutional rights
> and punishes the perpetrator with an award of punitive damages not only vindicates
> constitutional principles but is a deterrent to future violations, to the benefit not only of
> the plaintiff but of others in similar situations.

851 F.2d at 989 (emphasis added). See also Jaffee, 142 F.3d at 418 ("The seeming disproportion

between the fees sought by Jaffee's attorneys [$900,000-plus] and the damages awarded to Jaffee

[$100,000] is, standing alone, not dispositive").

    Even leaving all of that aside, Defendants' continuing refrain about what a "paying client"

would pay in a case like this is not the question they should be asking. Defense counsel had a

paying client in the very same litigation, the best of all available proxies. Chicago Prof'l Sports

---

[5] The Rivera Court cited the Senate Report accompanying §1988 in clarifying that winning civil
rights lawyers are to be paid "for all time reasonably expended on a matter," and those fees
should "not be reduced because the rights involved may be nonpecuniary in nature." Id.
("Because damages awards do not reflect fully the public benefit advanced by civil rights
litigation, Congress did not intend for fees in civil rights cases, unlike most private law cases, to
depend on obtaining substantial monetary relief").

Ltd. v. National Basketball Ass'n., 90 C 6247, 1996 WL 66111 (N.D. Ill. Feb. 13, 1996) ("the defendant's fees may provide the best available comparable standard to measure the reasonableness of plaintiffs' [fees because] each party in this case had to prepare to question the same witnesses, as well as review the same evidence and to resolve the same issues"). Here, Defendants' counsel are willing only to give Plaintiff credit for 1048 hours (Resp. at 22) when they themselves not only billed more than 4,000, but were paid for every last hour. Cf. Cintas Corp. v. Perry, -- F.Supp.2d --, 2007 WL 189014, *1 (N.D.Ill. Jan. 22, 2007) (Bucklo, J.) ("the Seventh Circuit has held that the best evidence of whether attorneys' fees are reasonable is whether a party has paid the fees"), citing Stark v. PPM Am., Inc., 354 F.3d 666, 675 (7th Cir. 2004.

This Court is undoubtedly at a disadvantage in deciding a fee petition in a case it did not oversee, but as predicted, Defendants' unyielding and relentless objections illustrate well why this litigation was as labor-intensive as it was. As the Court will see, Defendants have lodged countless unreasonable objections, frequently pretending to not understand the connection of the work to the case even when they do. The net result is to multiply needlessly the work facing the Court. JCW Investments, Inc. v. Novelty, Inc., 482 F.3d 910, 920 (7th Cir. 2007) (lower court relied on fact that "the case took on a life of its own unnecessarily and litigiously" where the defense "unnecessarily increased the fees sought by contesting practically every issue."). Defendants also refuse to concede virtually anything, even where they plainly should have. That was their prerogative, but it is not well-taken to complain that the resulting litigation was time-consuming. Garcia v. City of Chicago, No. 01 C 8945, 2003 WL 22175620 (N.D. Ill. Sept. 19, 2003) (approving similar fee petition because "the City's litigation tactics [via the same outside defense counsel in this case] multiplied the number of hours L&L's attorneys otherwise would have had to spend"), citing Johnson v. Kakvand, 192 F.3d 656, 662 (7th Cir. 1999) ("[a] party's uncooperativeness with pretrial proceedings will increase the amount of time that the opposing attorney must devote to the case, an increase that will then be reflected in the petition for attorneys' fees").

9

### D. Also Misplaced Are Defendants' Objections To Time Spent On Each Little Battle Plaintiff Lost Along The Way To Victory

In their spreadsheets, the defense has identified every last entry relating to battles that the defense purports to have won along the way. These objections fail for two reasons.

First, as set forth in Plaintiff's rebuttal to Defendants' objections (see Exhibit 1), Defendants have frequently over-claimed the degree to which they "won" the disputes at issue. More importantly, however, Defendants' approach to fee litigation is not supported by prevailing billing practices or by the surrounding case law.

As to the former, paying clients simply do not line-edit bills and refuse to pay for every unsuccessful maneuver made in the pursuit of victory -- or else defense counsel would themselves have made a lot less than the $1.2 million they took home. After all, defense counsels' paying client paid them to fight hard; that they won some battles and lost others (including the war itself) did not cause the City to cut their time by a single hour. The Court should not apply a different standard to the Plaintiff.

Unsurprisingly, the case law supports the Plaintiff. Jaffee v. Redmond, 142 F.3d 409, 413-17 (7th Cir. 1998) ("when plaintiffs attain success, courts should not decline to award fees to the plaintiffs' attorneys solely because certain zealous advocacy that was appropriately provided their clients did not contribute directly to that success. This approach would be at odds with the norms of professional responsibility."), citing Cabrales v. County of Los Angeles, 935 F.2d 1050, 1053 (9th Cir. 1991) ("If a plaintiff ultimately wins on a particular claim, she is entitled to all attorney's fees reasonably expended in pursuing that claim -- even though she may have suffered some adverse rulings" along the way).[6]

_____

[6] There are important policy reasons why this is so, because "[i]f arguments that do not contribute to a plaintiff's ultimate success were not eligible for compensation for that reason alone, then attorneys might be discouraged from raising novel but reasonable arguments in support of their clients' claims and a disincentive for strong advocacy could result." Jaffee, 142 F.3d at 415-17 ("The ethics of the legal profession counsel an opposite approach"); Partington v. Broyhill Furniture Indus., 999 F.2d 269, 273-74 (7th Cir.1993) ("A lawyer who figures out the likeliest outcome in his favor, and aims only for that, is likely to fall short. The good lawyer aims higher, and is not improvident to do so").

Given this, Defendants' attempts to parse out every motion and argument that Plaintiff (supposedly) lost is directly at odds with settled law. Cruz v. Town of Cicero, 275 F.3d 579, 593 (7th Cir. 2001) ("It is the ultimate outcome of the litigation that determines whether a plaintiff is a prevailing party, *not his or her success as to each motion filed in the case"*) (emphasis added); Kurowski v. Krajewski, 848 F.2d 767, 776 (7th Cir.), cert. denied, 488 U.S. 926 (1988) (refusing to cut time for research spent on unsuccessful arguments because "a losing argument in support of a successful claim for relief is fully compensable time") (quoting Hensley); see also Pressley v. Haeger, 977 F.2d 295, 298 (7th Cir. 1992) ("Hensley permits the court to award fees for losing arguments in support of prevailing claims. . .").

At the end of the day, the touchstone is not whether a particular argument was successful, but rather whether it was reasonable. People Who Care v. Rockford Board of Ed., 90 F.3d 1307, 1314 (7th Cir. 1996) ("A court's focus should not be limited to the success/failure of each of the attorney's actions. Rather, it should be upon whether those actions were reasonable."). Thus, the Seventh Circuit has found error where courts adopt the approach advocated by the defense here. See Jaffee, 142 F.3d at 413 ("The court denied fees to Jaffee by determining that time spent on or necessitated by an unsuccessful evidentiary argument made in support of an ultimately successful claim is not compensable. This is not an appropriate justification for denying fees; it conflicts with Supreme Court and Circuit precedent and, additionally, creates incentives that are in tension with the tenets of professional responsibility."); 87 South Rothschild Liquor Mart, Inc. v. Kozubowski, 775 F.Supp. 1129 (N.D. Ill. 1991) ("Clearly, Liquor Mart obtained excellent results from its attorneys. . . lawyers do spend time in 'blind alleys,' but this is both 'inevitable' and 'irrelevant'"), quoting Kurowski v. Krajewski, 848 F.2d 767, 776 (7th Cir. 1988).

### E. This Was Not A "Partial Success" Case, And No Cut In Hours Can Be Justified On That Basis

Where, as here, the plaintiff prevails with what he set out to accomplish, no fee reduction is justified merely because one of the claims did not pan out. As Hensley explained in language often relied upon by the Seventh Circuit:

11

> Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified. In these circumstances the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit. Litigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee. The result is what matters.

461 U.S. at 435; Jaffee, 142 F.3d at 413 ("Hensley makes clear that when claims are interrelated, as is often the case in civil rights litigation, time spent pursuing an unsuccessful claim may be compensable if it also contributed to the success of other claims").

Reviewing the various counts pled here, all center around the same core nucleus: In County of Riverside v. McLaughlin, 500 U.S. 44 (1991), the Court held that arrestees must be brought before a judge within 48-hours of arrest, absent extraordinary circumstances. In violation of that important freedom, Mr. Lopez alleged that he was subjected to torturous conditions of confinement for four days in an interrogation room without being taken to see a judge, all in an effort to coerce him confess to a crime he did not commit. He was deprived of food, sleep, bathroom breaks, and even punched once on his way to the room.[7]

Despite all of the different legal theories/labels pled (e.g., intentional infliction, unlawful detention, "police torture," and conspiracy) the gravamen of the Complaint is one unitary grievance. Unlike some cases, any attempt to subdivide that grievance into distinct pieces is artificial. Lenard v. Argento, 808 F.2d 1242, 1245-46 (7th Cir. 1987) ("For tactical reasons and out of caution lawyers often try to state their client's claim in a number of different ways, some of which may fall by the wayside as the litigation proceeds. [If the lawyer]. .

---

[7] Defendants' Response describes the underlying facts in a light most favorable to them, to say the least. Plaintiff testified that he was shackled to the wall for much of his four-day stay in the interrogation room before seeing a judge, making meaningful sleep impossible, and leading to hallucinations. As Defendants point out, various police officers did testify that Mr. Lopez was not starved (they claimed they bought him fast food on their own dime) but none could prove it. In the end, Defendants' description of multiple hostile police officers and "four different State's Attorneys" all insisting that Plaintiff was "lucid" and "well-treated" only serves to illustrate the difficulty Plaintiff faced in winning the case.

. presents a congeries of theories each legally and factually plausible, he is not to be penalized just because some, or even all but one, are rejected, provided that the one or ones that succeed *give him all that he reasonably could have asked for*.").[8]

Where Defendants' argument really falls flat, however, is its assumption that every last time entry relating to Gomez and Meyers must be surgically excised from Plaintiff's fee petition just because Plaintiff lost the excessive force claim at trial. What Defendants fail to appreciate is that Gomez and Myers would have been deposed and the subject much discovery regardless of the punch allegation. These were the two officers who first arrested Mr. Lopez and who accused him of lying, an explanation upon which Defendants relied so heavily in seeking to justify the extended detention. It would not be understatement to conclude that Gomez and Meyers' account of Mr. Lopez' lying was a centerpiece of the defense to the detention claims. See Lopez, 464 F.3d at 717.

Viewed properly, therefore, none of the work around Gomez and Meyers would have been avoided even if Plaintiff had not pursued the punch as a separate claim. Defendants' attempt to scrap all of the hours relating to Gomez and Meyers is thus unavailing. Hensley, 461 U.S. at 435 (where claims involved a common core of facts "[m]uch of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis. Such a lawsuit cannot be viewed as a series of discrete claims. Instead the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation").[9]

---

[8] Defendants' Response points out that they moved for summary judgment on a "false arrest" claim notwithstanding that "false arrest was not formally pleaded. . ." Resp. at 2 n.1. Defendants thus filed a motion for summary judgment on a non-existent count, proving that the defense in this case is nothing if not thorough. In trumpeting this strawman as a "victory," Defendants are also over-stating their success; the truth is, the district court completely *ignored* their false arrest argument. See Lopez v. City of Chicago, 01 C 1823, 2004 WL 725790 (N.D.Ill. March 31, 2004).

[9] Moreover, Defendants ignore the equity argument discussed in Plaintiff's Petition. Having subsequently admitted they never should have persuaded Judge Der-Yeghiayan to distort the jury's perception of the trial with an ill-advised directed verdict, Defendants should not be permitted to capitalize on the fruits of the mess they themselves created.

Thus, if the lawsuit and trial is viewed in context, the fact that Gomez punched Plaintiff once (in the presence of Myers) had little to do with what the case was about. No real damage from the punch was ever alleged, and no lawsuit would have been filed if that was the only injury. Rather, Plaintiff relied on the punch to the extent it set the context for the abusive interrogation. The fact that an officer resorted to physical force not only proved that the police were willing to cross the lines into unlawful behavior, but it also helped explain why Mr. Lopez was less than forthcoming in the manner alleged by the defense.

None of that changes the reality that first and foremost, this case was always about what happened during the five days spent in the police station, and whether that treatment violated the constitution. The amount of time and energy spent disputing whether Plaintiff got punched ("yes I did" versus "no you didn't") was a infinitesimal fraction of the energy spent on the real issues in this litigation. Dunning v. Simmons Airlines, Inc., 62 F.3d 863, 873 (7th Cir. 1995) ("Because of the interrelated nature of the two claims, her attorneys had to prepare for the 'litigation as a whole'") (quoting Hensley). Indeed, defense counsel barely even mentioned the punch during his entire opening statement. See Exhibit 13.

Under the case law, therefore, this does not qualify as a partial success case for which a downward departure from the lodestar is warranted. Dunning, 62 F.3d at 873 ("Where a plaintiff has obtained excellent results, [his] attorney should recover a fully compensatory fee, and that. . . fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit."); Calderon v. Witvoet, 112 F.3d 275 (7th Cir. 1997) ("meat-axe. . . [p]ercentage reductions of the kind the district court used are not a good way to make adjustments for partial success"), citing Lenard, 808 F.2d at 1245.[10]

---

[10] In opposition, the partial success cases relied upon by Defendants' Response are distinguishable to the point that they support Plaintiff's position. See Ustrak v. Fairman, 851 F.2d 983, 986 (7th Cir. 1988) (reducing fees because plaintiff won claim about only one of three discrete prison incidents that occurred at three different times over a two year period); Jackson v. Illinois Prisoner Review Bd., 856 F.2d 890 (7th Cir. 1988) (time spent briefing motion to dismiss *ex post facto* claim "was unrelated to [plaintiff's] eventually successful due process claim. . . These claims are distinctly different, based on different facts"); O'Sullivan v. Chicago, 484

(continued...)

**F.      The Hours Plaintiff Spent Proving The Policy Claim Is Fully Compensable**

Of all of their arguments, the most unsupportable is Defendants' position that the time spent proving the Monell time is allegedly uncompensable.  Plaintiff explains as follows.

**1.      After The Disputed Discovery Was Already Completed By Plaintiff's Counsel, The City Stipulated To Monell Liability By Affirmatively Waiving The Need To Prove A Policy And Practice**

In his original Complaint, Plaintiff alleged that his constitutional injuries were caused by a policy and practice on the part of Chicago.  The City flatly denied these allegations.

Discovery proceeded, and Plaintiff spent a fair amount of time and energy proving the policy and practice claim against the City.[11]  As recognized by a long line of Supreme Court case law, this was undoubtedly a legitimate (and compensable) goal.  Owen v. City of Independence, 445 U.S. 622, 651-52 (1980) (The knowledge that a municipality will be liable [under §1983] for all of its injurious conduct. . . should create an incentive for officials who may harbor doubts about the lawfulness of their intended actions to err on the side of protecting citizens' constitutional rights. . . . A damages remedy against the offending party is a vital component of any scheme for vindicating cherished constitutional guarantees, and the importance of assuring its efficacy is only accentuated when the wrongdoer is the institution that has been established to protect the very rights it has transgressed.")

---

(...continued)

F.Supp.2d 829, 842 (N.D. Ill. 2007) (court refused to reduce the $642,000 fee petition given the overall success of the litigation: "True, in this case the Plaintiffs prevailed on only one of the three 'related' claims; in this sense, one could characterize their success as 'limited.' But Hensley makes clear that the 'award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit. . . It is perfectly possible to prevail on only one of several claims, and still obtain every bit of relief sought. . . This is not a case where Plaintiffs sought 'X dollars' and walked away with less than half that amount. Nor is it a case where Plaintiffs sought primarily equitable relief, and ended up with only nominal damages. The 'award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit.'").

[11] As documented in more detail below, although the court initially stayed the City's obligation to respond to Plaintiff's Monell discovery, the Court never "barred" Plaintiff from pursuing this discovery, and, in any event, even that stay was lifted a short time later.

Through the efforts of L&L, Plaintiff was able to establish that the constitutional injuries alleged in this lawsuit were isolated events, but were rather undertaken pursuant to the very policies and practices of the CPD. Plaintiff's evidence in this case established that at the time of Mr. Lopez's arrest (before the City's policies were changed in the middle of this case), the CPD permitted detectives to hold arrestees for days without seeing a judge in interrogation rooms based on "justifications" that the Seventh Circuit ultimately determined were totally unconstitutional under the County of Riverside v. McLaughlin test.

The City very much wanted to avoid litigating the Monell claim in this case. Summary judgment, however, would have been a nonstarter, so the City filed a motion seeking to "moot" the Monell claim based on its promise to accept judgment against the City in the event Plaintiff prevailed in establishing a constitutional violation. R. 147.

Attached as Exhibit 4 is a copy of this motion by the City to "bar trial" on the policy claims on mootness grounds given its waiver of liability. In it, the City argued that the Court should "bar" Plaintiff from proving his Monell claim at trial given the City's representation that the Monell claim was "moot" because the City was promising to give Plaintiff everything he would have gotten if he had won the Monell claim. Id. at 5 (arguing that the court should bar Plaintiff from proving the Monell claim given the City's willingness to stipulate to judgment because Plaintiff would thus no longer have any "economic reason to continue litigating his 'policy or practice' claim against the city"). To quote the City's own motion, "in this case *the City has offered all the relief that Plaintiff could possibly obtain* if he successfully litigated the policy issues of his §1983 claims against the City." Id. at 5.

Plaintiff objected, asking Judge Der-Yeghiayan to permit him to prove the Monell claim at trial, particularly since he had already developed the evidence. As Plaintiff pointed out, the Federal Rules of Civil Procedure provide specific mechanisms for resolving disputes (such as Rule 56) and "mootness" stipulations are not among them. R. 149.

Over Plaintiff's objections, the court accepted the City's position that the Monell claim was "moot" in light of the City's promise to provide Plaintiff everything he would have received

16

had he prevailed on that claim. R. 160. Accordingly, Plaintiff was "barred" from proving the policy and practice claim at trial. The Seventh Circuit summarized:

> Lopez sued the City of Chicago under [Monell], alleging the City had a policy or practice of detaining persons arrested without a warrant beyond McLaughlin's 48-hour time period for a probable cause hearing. Lopez obtained affidavits from fourteen warrantless detainees who were held in interrogation rooms by Chicago Police for multiple days, in violation of McLaughlin, shackled, deprived of food and sleep, and otherwise treated in the same manner as Lopez. *The City then entered a Monell waiver,* consenting to judgment against it in the event "the finder of fact in this case finds that any City of Chicago employee violated Plaintiff's rights under the Constitution." *On the basis of this waiver, the City moved to bar evidence of other detainees' treatment, and the district court granted the motion.*

Lopez, 464 F.3d at 717 n.1 (emphasis added).

Having disposed of the Monell claim by promising that Plaintiff would receive "all the relief that Plaintiff could possibly obtain if he successfully litigated the policy issues" in the more traditional manner (*i.e.,* by proving them), the City now turns around and argues that Plaintiff should be penalized in attorneys' fee terms for having supposedly failed to prevail on the Monell claim. The disingenuousness of that position is outrageous. The City promised "all the relief that Plaintiff could possibly obtain" if he won, and "all the relief" must mean just that: "all the relief." The only proper analogy is that after playing dead to win a cease-fire, the City now wants to stand up again after the fact and resume shooting. That about-face is obviously unacceptable.

>     **2.    The Record Confirms That The So-Called "Monell-Waiver" Was Proposed By The City And Accepted By The District Court *After* Plaintiff Expended The Attorneys' Fees To Prove The Monell Claim**

The City's revisionist attempt to cast itself as the "victor" (and Plaintiff as the loser) on the Monell claim cannot be squared with the record. Put simply, all of the successful Monell work presently disputed by the City in fact preceded -- and was thus the driving impetus behind -- the City's offer to have judgment taken against it directly in the event of a constitutional violation in exchange for avoiding trial on the Monell claim. Under those circumstances, there is no basis for challenging any pre-wavier Monell time.

Defendants correctly point out, Judge Darrah initially stayed discovery on the Monell claim back on February 28, 2002. R. 44 (Order of 2/28/03, which also denied the City's attempt

17

to sever the Monell claim out of the case). That stay only relieved the City of the obligation to comply with discovery requests (and thus did not bar Plaintiff from spending time to prove the claims), but, regardless, the stay was lifted soon thereafter.

In particular, on October 24, 2002, Judge Darrah granted Plaintiff leave to pursue class allegations based on the very same set of facts giving rise to the policy allegations. R. 68; Lopez v. City of Chicago, 01 C 1823, 2002 WL 31415767 (N.D. Ill. Oct. 25, 2002). In permitting discovery to resume as of October 2002, Judge Darrah was very clear: "The discovery as to the Monell claims *is similar, if not identical,* to the discovery that will be needed for the issue of class certification." Id. at *3.

After Judge Darrah's ruling, the parties engaged in extensive discovery on the subject of whether what happened to Mr. Lopez was consistent with the City's policy and practice for treatment of arrestees. As Judge Darrah recognized, while relevant to the class certification issue (which never went forward in this case) this discovery was equally critical to Plaintiff's efforts to establish a municipal policy. Id.

The City's suggestion to this Court that the Monell discovery was supposedly never unstayed is thus an improper attempt to take advantage of the Court's lack of familiarity with the procedural history. Indeed, the City's present position is contradicted by its own words in prior briefing before other judges, wherein the City, for example, stated on December 13, 2004 that before the class allegations were withdrawn, "**discovery on the policy claims was complete**. . ." See R. 174; Exhibit 5 at 1 (emphasis added). Likewise, the City's motions *in limine* acknowledged to Judge Der-Yeghiayan on December 29, 2004, that "Plaintiff devoted considerable effort to both maintaining a class action *and developing evidence of municipal policy.*" R. 176; Exhibit 6 at 11 (emphasis added). Compare Def. Resp. at 10 (representing incorrectly to this Court that: "the District Court stayed Monell discovery on February 28, 2002, and never lifted the stay. Plaintiff cannot make any good faith claim that he was conducting Monell discovery when he was expressly ordered not to.").

18

Once the City's misimpression is corrected, what the Court is left with is the following: Plaintiff's Complaint alleged a policy and practice. The City denied it. After a brief stay, <u>Monell</u> discovery proceeded. The City can deny all it wants that Plaintiff developed over two years of discovery enough proof to win a <u>Monell</u> claim, but what is not in dispute is that the City cried "uncle" and agreed to provide "all the relief that Plaintiff could possibly obtain if he successfully litigated the policy issues." Under any fair analysis, all of the time spent by Plaintiff's counsel proving the policy claim *prior to* the City's "waiver" (*i.e.,* all of the time claimed in the Petition) is clearly compensable.

### 3. Plaintiff Won The <u>Monell</u> Claim

Not only is the City's attempt to escape payment on the <u>Monell</u> claim inconsistent with its prior promise, but it fails for the even more fundamental reason why the <u>Monell</u> time is compensable: Plaintiff won the claim. In an appeal captioned <u>Lopez v. City of Chicago</u>, the Seventh Circuit directed that judgment be entered in Plaintiff's favor on the constitutional claim. Granted, Plaintiff got his municipal liability judgment by a slightly unusual route in that the City waived proof of the required policy and practice because it did not want the jury to hear the evidence. <u>See</u> Exhibit 7 (waiver). But a <u>Monell</u> claim it was, and a <u>Monell</u> victory it was. The fact that the City decided to stipulate to the policy and practice element after Plaintiff amassed all of the evidence cannot now be wielded by the City to deprive Plaintiff of that victory.

### 4. The City Cannot Escape Its Obligation To Pay By Trying To Recast the Policy Discovery as Class Action Time

Plaintiff has already deleted from the lodestar all time spent pursuing briefing on the class certification and amendment issues. That much is not in dispute. But the City wants to take it one step further and delete all of the time spent proving the policy and practice merely because this discovery all also bears upon the class claims. This is inappropriate. As a matter of basic logic, the fact that discovery relevant to the <u>Monell</u> claim also happens to prove a different point

in another case is not a reason to deny compensation for a claim on which Plaintiff clearly prevailed (albeit by capitulation, but prevailed nonetheless).[12]

### G. Defendants' Efficiency Objections Should All Be Rejected

Not the least bit chagrined about having been paid more than $1.2 million (as of last year) in the losing cause, while simultaneously insisting that only $248,785 is reasonable for Plaintiff's attorneys, the defense tries to dismiss the one million dollar disparity as a "red herring." See Def. Resp. 20 (arguing: "Plaintiff's unnecessary verbiage about total hours is a red herring, because the total number of hours in dispute are limited." *[sic?]*).

There are no red herrings here. Defendants spent almost twice as many hours on the same case that the Plaintiff did, and Defendants' time is an extremely useful proxy for the efficiency and reasonableness of Plaintiff's fee petition. Garcia v. City of Chicago, No. 01 C 8945, 2003 WL 22175620 (N.D. Ill. Sept. 19, 2003) (Plaintiff's request was reasonable by comparison to greater hours spent by the defense).[13]

Defendants also argue without a shred of support that the defense routinely outspends the plaintiff in litigation, but they were strikingly unable to find a single case (other than defense counsel's own cases) where this actually occurred. Moreover, Plaintiff suspects that this Court's own experience confirms that the plaintiff almost always outbills the defense in a case such as this: Both sides attend the same depositions/court proceedings (suggesting at least an equality of time) but the plaintiff bears the burden of proof, and must work that much harder to discover facts that are largely in control of the defense. Compare Spina v. Forest Preserve Dist. of Cook County, 98 C 1393, 2002 WL 1770010, *6 (N.D. Ill. July 31, 2002) ("The Court finds it entirely

---

[12] If there remained any doubt, many of the witness depositions at which Plaintiff attempted to prove that Mr. Lopez' treatment was standard were attended by both Jones Day (the defense firm brought in after the class allegations were added) and Ancel Glink (which never dealt with class action issues at all). See Exhibit 8.

[13] Defendants respond with some indignance that Plaintiff is supposedly suggesting that the defense spent an unreasonable number of hours on the case. Deliberately or not, Defendants have missed the point. Plaintiff agrees that Defendants' counsel spent a reasonable number of hours on the case, which is why their client paid for all of them. But Plaintiff's total (overall, less than two-thirds of the defense's) is no less reasonable.

reasonable that [plaintiff's counsel] would expend more hours prosecuting this case than defense counsel spent defending it; particularly in light of [plaintiff's] level of representation and the outcome she achieved in this case").

### 1. Other Courts Have Overwhelmingly Rejected These Sorts Of Objections To Loevy & Loevy Fee Petitions

Judges who have considered L&L's petitions have approved an extremely high percentage of the hours sought. L&L is proud of the extent to which courts have found our bills reasonable notwithstanding the very sort of objections raised here by the defense. To take an example, attorney Jon Loevy has submitted 3,833 hours in five adjudicated fee petitions for work performed over the past decade, and just shy of 99% of those hours (3,762) have been approved by courts. See Garcia, 2003 WL 22175620 (Holderman, J.) (striking a total of 2.5 hours from L&L's 2000+ hour fee petition, and rejecting many of the same Ancel Glink objections raised here); Robinson, 2004 WL 2033714 (Plunkett, J.) (approving 1258 of 1262 hours submitted by Loevy); Medina v. City of Chicago, 00 C 1, 2001 WL 1104600 (N.D. Ill. Sept. 14, 2001) (Kennelly, J.) (striking only 1.75 hours from the firm's entire fee petition); Dominguez, Case No. 04-2907 (Exhibit 10) (Shadur, J.) (approving L&L's entire petition where defense largely conceded reasonableness); Smith v. City of Urbana, Case No. 01-2209 (Exhibit 14) (Baker, J.).

Those are powerful statistics. They corroborate that L&L is a reasonable biller, and they show that the types of objections Ancel Glink now raises (and has raised unsuccessfully in the past) should be rejected. Berthold Types Ltd. v. Adobe Systems, Inc., 186 F.Supp.2d 834, 840 (N.D.Ill. 2002) (Bucklo, J.) ("Berthold merely alleges that the research was 'superfluous' and 'excessive' and that the attorneys duplicated each other's work, but mere allegations are insufficient to overcome Adobe's evidence of reasonableness").

Turning to the objections raised by the defense, none have merit.

### 2. Plaintiff's Time Should Not Be Cut For Purportedly Duplicative Efforts

In litigation over past fee petitions with Ancel Glink, Plaintiff's counsel has gone over the defense bills to find repeated examples of the very same practices they complain about. Plaintiff

is not going to spend any more hours doing that here, because (a) too much time has already been spent defending reasonable fees; and (b) it is unnecessary. With the defense having spent more than 1,000 hours more than Plaintiff did on the same case, the "duplicative effort" standard to which they ask this Court to hold Plaintiff has necessarily been loosened by their own paying client.

To take just a few easy illustrations, despite objecting to every entry in Plaintiff's bills with more than one attorney at a deposition, defense counsel themselves showed up for at least a dozen depositions with multiple attorneys from multiple law firms. See, e.g., Exhibit 8. Likewise, as this Court undoubtedly knows from personal experience, the City's Law Department routinely sends two lawyers to every status hearing (ostensibly representing the City and the officers, even though their interests overlap). This case was no exception, as Chicago paid outside counsel to send two, and sometimes three lawyers to every hearing.

Not that Plaintiff agrees that there are duplicative efforts in L&L's bills, but the point is, Defendants should not be permitted to pour over Plaintiffs' bills for every instance they can find where two lawyers worked simultaneously on a task and seek a cut. See Watson v. Sheahan, 94 C 6891, 1998 WL 708803 (N.D. Ill. Sept. 30, 1998) (Bucko, J.) ("Defendants, without citing any authority, object to two of plaintiffs' attorneys being present at two depositions and two court appearances. The Seventh Circuit has agreed that it is reasonable in a lengthy complex litigation, with substantial discovery, to have more than one attorney attend a court appearance or a deposition"), citing Uniroyal Goodrich Tire Co. v. Mutual Trading Corp., 63 F.3d 516, 525 (7th Cir. 1995). Having itself paid to staff this case robustly, the City cannot maintain that Plaintiff was not entitled to a similar advantage.

Finally, Plaintiff notes the glaring flaw in Defendants' complaints about purportedly redundant staffing. In default of Local Rule 54.3, Defendants have refused to provide even any

22

estimates of the hours spent by the in-house lawyers, who were a constant presence in the background of the litigation.[14]

In other words, all of the City's own "duplicative" efforts are exactly what Defendants seek to cut from Plaintiff. Having refused to produce reciprocal records, their "inefficiency" objections should be rejected out of hand. See Cooper v. Casey, 897 F. Supp. 1136, 1139-40 (N.D. Ill. 1995) ("it is unpersuasive for [Chicago] defendants to cavil at plaintiffs' division of labor as purportedly overlapping and inefficient, when defendants' own expenditure of time cannot be evaluated for comparative purposes because they do not account for their time at all"), *rev'd on other grounds,* 97 F.3d 914 (7th Cir. 1996).[15]

In response, Defendants argue weakly (Resp. at 20) that corporation counsel's time need not be produced pursuant to Local Rule 54.3 (or even estimated, as it was in the Bogden case discussed in Plaintiff's Petition, wherein the City sought fees and thus managed to create time sheets) because Defendants do not object to the time Plaintiff spent on appeal. This is nonresponsive. In Farfaras v. Citizens Bank and Trust of Chicago, 433 F.3d 558, 569 (7th Cir. 2006), the Seventh Circuit rejected this very argument:

> Defendants' counsel claimed before the district court that its billing records were irrelevant. This position is inconsistent with the letter and spirit of Local Rule 54.3. The rule's purpose is *to avoid exactly the type of hypocritical objections* presented by the defendants. Although the defendants object to the use of block billing and 'vague' descriptions by Farfaras's counsel, the defendants' counsel used similarly vague descriptions and block billing. Although 'block billing' does not provide the best possible description of attorneys' fees, it is not a prohibited practice.

---

[14] For example, defense counsel billing records (Exhibit Z) reflect that on March 10, 2005, three lawyers from Ancel Glink (Allen Duarte, Darcy Proctor, and Tom DiCianni) met with Mara Georges, Jeff Given, First Assistant Ted Chung, Joe Pollick, and Tom Samson -- possibly the five highest supervisors in the City's Law Department. The specific subject of the meeting has been redacted and/or omitted from all of the bills that were produced, and none of Georges, Given, Chung, Pollick, Samson produced any records or even estimates.

[15] As Judge Shadur put it in Latino v. Kaizer, 864 F.Supp. 835, 838-39 (N.D. Ill. 1994): "Defense counsel's response was that no time records of any sort are kept by the lawyers in [Chicago's] corporation counsel's office. . . That meant that one frequently reliable source of measuring the reasonableness of time spent by a prevailing party -- that is, the corresponding work done by the losing adversary's lawyers -- was unavailable to this Court. Lacking such comparative information, this Court has been tendered nothing but defendants' *ipse dixit* as a purported basis for reducing plaintiffs' claim."

See also Garcia, 2003 WL 22175620 (approving fee petition in part because Law Department lawyers "spent hundreds of hours working on this case" without providing time sheets).

In sum, having staffed the case the way they did, and having refused to produce their own supervisors' and appellate lawyers' records, the City cannot now legitimately expect the Court to do a line-by-line critique of every purportedly wasteful staffing decision in Plaintiff's bills. Vardon Golf Co., Inc. v. Karsten Mfg. Corp., 99 C 2785, 2003 WL 1720066, *4 (N.D. Ill. March 31, 2003) ("The Court will not involve itself in the kind of minute micro-managing of attorney's billing practices that Vardon's position would require. Beyond the principle of reasonableness, parties need not justify their billing practices nor their use of time and resources in litigation.").

### 3. Defendants' Objections About Purportedly Non-Legal Work Should Be Rejected

In their spreadsheets, Defendants object to tasks such as reviewing documents to prepare for depositions, and trying to develop witnesses. While it may be possible to nit-pick at an entry here or there, the bottom line is that Plaintiff got the overall job done with so many fewer attorney hours that the resulting bill is reasonable. Petersen v. Gibson, 2002 WL 31738798, *1 (N.D. Ill. Dec. 4, 2002) (Zagel, J.) ("Could one conclude that some of the lawyers spent too much time on one matter or another? Possibly, but I am not inclined to do so... The bottom line is... I do not find that any of the time spent is unreasonable").[16]

### 4. Purportedly "Excessive, Unreasonable, Unnecessary Work"

"In general, the losing counsel's testimony that he could have done the winning counsel's work in less time, while relevant, is not worth much standing by itself." Mohr v. Chicago School Reform Bd. of Trustees, 194 F.Supp.2d 786, 789 (N.D.Ill. 2002) (Bucklo, J.) ("If the winning counsel had taken less time, he might not be a position to ask for attorneys' fees. . ."). Defendant

---

[16] Moreover, in yet another example of unrecognized irony, Defendants argue that all but 12 hours spent by L&L paralegals should be stricken. Thus, according to the defense, Plaintiff's counsel are not only foreclosed from doing tasks the defense deems overly "paralegal," but they should also be denied any paralegal assistance. And all this while defense counsel themselves used 137 hours of paralegal assistance to go along with their 4,000+ total attorney hours. See Exhibit Z.

try to characterize L&L's efforts as "excessive" and "inefficient" in a dozen different ways, but they have no persuasive explanation for why, if this is so, L&L was able to prevail over Chicago even though the defense spent so many more hours on the same case.

A telling illustration of the true merit of Defendants' position is their line-by-line objections to Plaintiff's trial hours. As the Court will observe, Defendants have searched for every entry where they urge the Court to concluded that Plaintiff "overstaffed" the trial itself, asking the Court to conclude that it was unreasonable to have three trial lawyers.

The objections are hypocritical to the point of absurdity. There was not one trial day the Defendants did not have three trial lawyers themselves, and on at least three days they had four. See Exhibit Z (Ancel Glink records for 3/14/05; 3/15/05; 3/16/05; 3/17/05; 3/20/05; 3/21/05; 3/22/05; and 3/33/05). Thus, the City urges the Court to view three lawyers as excessive for Plaintiff even while the City paid at least three lawyers to sit at the City's trial table (in a case it now contends mattered little).

More significantly, from Day 1 of the trial through the end, the defense outbilled Plaintiff's counsel 356 trial hours to 285. Id. It is thus entirely misplaced to nit-pick at Plaintiff's trial time, and argue that one or more lawyers should have stayed home on a given day. See also Dominguez, Case No. 04-2907 (Exhibit 10 at 8-9) (rejecting same objection that Arthur Loevy did not address the jury, where the City had the same number of trial lawyers); Exhibit X, Garcia, 2003 WL 22175620, at *2 (same).

Defendants' objections are thus not well-taken. As Judge Holderman put it in Garcia: "The City cannot seriously argue that L&L overstaffed this case, in light of its own staffing. The City had several attorneys in the corporation counsel office and three outside law firms working on this case. Moreover, the City, like plaintiff, had three trial counsel. In addition, several more supervisory City attorneys attended the trial from time to time." Garcia, 2003 WL 22175620 at *5 n.10.

The inevitable conclusion is that Defendants' unreasonableness in characterizing Plaintiff's time as unreasonable has created far more work for everyone than there should be.

Lenard v. Argento, 808 F.2d 1242, 1245 (7th Cir. 1987) ("Defendants should not have wasted our time with. . .complaining that Lenard was represented by three lawyers. The defendants were also represented by three lawyers. . ."). As did Judge Holderman in Garcia, this Court should approve the entire petition. 2003 WL 22175620 at *4 ("Although L&L's time records are neither models of clarity nor entirely devoid of the discrepancies the City's counsel points out, this court cannot find that L&L's [2,194] hours on the whole are unreasonable," at least in part because corporation counsel failed to provide records at all).

### 5. Defendants' Proposed 10% Reduction For Plaintiff's Billing Practices Must Be Rejected

On top of their proposed cut of roughly 70% of Plaintiff's lodestar based on specific objections, Defendants also propose an additional 10% cut (leading Plaintiff to wonder whether defense counsel rebated the City any set percentage based on their own lack of success). No other judges have imposed such a cut based on L&L's billing practices, and there is no justification to do so here.

One of the themes of this Reply is billing-practice hypocrisy, but Defendants take it to a new level in protesting bills in quarter-hour increments. Defense counsel themselves submitted to their own client plenty of bills in quarter-hour increments. See Exhibit 9.[17]

Regardless, there is absolutely nothing inherently wrong with billing in this fashion, which L&L has done without any judicial reductions for every fee petition they have ever submitted. Garcia, 2003 WL 22175620, at *5 n.11 ("Contrary to the City's arguments, this court finds that L&L sufficiently accounted for the time of each attorney. Although L&L used shorthand for many entries, they are clear enough to describe the tasks completed on the day in question and provide at least as much detail as the Ancel Glink time records"); Dominguez, Case No. 04-2907 (Exhibit 10, 8/22/07 Tr. at 9-10, observing that L&L quarter-hour bills are not the abusive kind). None of Judges Holderman, Kennelly, Baker, Plunkett, or Shadur had any

---

[17] Defendants' complaint that some entries get "rounded up" ignores the reality that plenty of short tasks that do not take at least 15 minutes get wiped out altogether. The net result is bills that have been repeatedly approved, including by defense counsels' own client.

problem with the manner L&L "block" bills in quarter-hours, and this Court should follow suit.
Cf. Cintas Corp. v. Perry, -- F.Supp.2d --, 2007 WL 189014, *1 (N.D.Ill. Jan. 22, 2007) (Bucklo,
J.) (rejecting "block billing" objection where "[m]ost time entries appear to be less than two or
three hours and most do not aggregate more than one type of task into the billing entry"); Markon
v. Bd. of Educ. of Chicago, 2007 WL 1232196, *3 (N.D.Ill. April 25, 2007); (Bucklo, J.) ("I do
not find the entries defendants attack as 'lumping' prevent a court from determining whether the
time was reasonably spent"); See also Spina, 2002 WL 1770010 at *7 ("while block billing 15
hours a day typically might be deemed too vague and excessive to warrant payment, such entries
are entirely appropriate when devoted to trial preparation just before and during trial").[18]

## II.     Plaintiff's Counsels' Hourly Rates Should Be Approved

### A.     Plaintiff's Counsel's Rates Have Recently Been Adjudicated

Last week, there was a development that controls the dispute over Plaintiff's hourly rates.
On August 21, 2007, in Dominguez v. Hendley, Case No. 04 C 2907, Judge Shadur adjudicated a
fee petition arising out of a successful Section 1983 case brought by L&L attorneys. Plaintiffs'
counsel submitted, and Judge Shadur approved, the following rates:

| Lawyer | Hourly Rate |
|---|---|
| Arthur Loevy | $450/hour |
| Jon Loevy | $375/hour |
| Michael Kanovitz | $345/hour |
| Mark Reyes | $345/hour |
| Danielle Loevy | $325/hour |
| Jon Rosenblatt | $255/hour |
| Paralegals | $105/hour |

See Exhibit 10.

In approving these rates, the court took note of "what's been happening recently in terms
of lawyer pay and the corresponding dramatic increase in lawyer earnings, which has nothing to
do with inflation or the cost of money. It's just been skyrocketing." Id. at 5. Not only were the
foregoing rates approved, but the court went so far as to observe: "[w]hen I look at the hourly

---

[18] The only time defense counsel succeeded with a blanket-percentage reduction argument
against L&L was when the Robinson case was re-assigned to a judge who had not seen the
litigation. However, Judge Plunkett reconsidered and rescinded this reduction after learning
more about the litigation, a decision affirmed by the Seventh Circuit. 489 F.3d 864, 871-74.

rates that are included there, and look at them in terms of what has happened [in the current market] to the hourly rates, you [defendants] are getting -- *I won't characterize it as 'bargain basement,' but certainly getting a break in terms of the rates that are sought, given the experience of the counsel involved."* Id. at 5-6. The court concluded:

> As far as I'm concerned, I have looked at the application. *It seems to me that the rates are quite consistent with, and indeed under, what has been the prevalent practice now of accepting current rates.* . . [W]e are taught by the Court of Appeals that the market is all wise.

Id. at 7-8 (emphasis added).

With Plaintiffs' counsels' hourly rates having been recently adjudicated, the burden shifts to the defense to show a "good reason why a lower rate is appropriate here." Gautreaux v. Chicago Housing Auth., 491 F.3d 649 (7th Cir. 2007) ("once an attorney provides evidence establishing his market rate, the opposing party has the burden of demonstrating why a lower rate should be awarded") (citations omitted). In this case, the Defendants have come nowhere close to meeting their burden to show why a lower rate is the only appropriate result.

### B. Defendants' Objections Are Unavailing

Defendants' Response focuses on cases involving rates awarded to other civil rights attorneys, including some prominent ones, but there is a glaring flaw in their analysis: Virtually all of the rate comparison cases they cite are *at least* five years old, and most much more so. In the order presented, Defendants rely on cases from 2000 (Jud Miner);[19] 1995 (Ken Flaxman);

---

[19] Seven years ago, this Court did award Jud Miner a rate of $325/hour (based on the fact that Judge Castillo had awarded him the same rate in 1998), but the Court specifically noted that Mr. Miner had failed to do a good job of presenting any evidence of the prevailing market as required by the Local Rules. Barnett, 122 F. Supp. 2d at 917 ("Plaintiffs have not presented much evidence"). Moreover, Mr. Miner himself submitted an affidavit in the case at bar averring that the rates presently sought by L&L are in line with his firm's *current* rate structure. See Exhibit S. This is consistent with the fact that based on inflation alone, the present value of a 1998 award of $325/hour is the equivalent of $415/hour today. See http://data.bls.gov/cgi-bin/cpicalc.pl.

1999 (Ed Stein); 1999 and 2000 (Harvey Grossman);[20] 2001 (John DeRose);[21] and 2002 (Phil Beck).[22]

Defendants unwillingness to fight the battle in the context of the *current* market is no accident. The relatively-recent billing rate spike documented in Plaintiffs' Petition means that what was appropriate twelve, nine, eight, or even four years ago is far less relevant than the evidence in Plaintiffs' petition regarding the *current* market rates.

On that latter subject, Defendants silence is deafening. Much as Defendants would prefer to talk about what Ken Flaxman was billing twelve years ago, and notwithstanding their reliance on fee cases from the late 1990s/early 2000s, what is striking about the Response is the absence of any comparison cases decided in the past two years.

Conspicuously ignored by the defense, for example, is Plaintiff's citation to Judge Kennelly's decision in 2006 awarding $425/hour to a 1996 graduate (three years less experience than Kanovitz and Jon Loevy) in a civil rights case; $340/hour to a 2000 graduate; and $585/hour to the senior partner (who has been a lawyer for a decade shorter than Arthur Loevy). Entertainment Software Ass'n v. Blagojevich, 05 C 4265, 2006 WL 3694851 (N.D. Ill. Aug. 9, 2006). Similarly, Judge Leinenweber's 2006 decision in Delgado v. Village of Rosemont, No. 03 C 7050, 2006 WL 3147695 (N.D. Ill. Oct. 31, 2006) to award $375/hour to a civil rights attorney

---

[20] Defendants cite a 1999 decision in which Grossman was awarded $260/hour and then another decision only one year later in which his rate jumped to $290/hour. At that rate of escalation alone ($30/hour/year), Grossman would be over $500/hour today.

[21] As Plaintiff's counsel has previously pointed out to Ancel Glink in other rounds of fee briefing, reliance on Bull v. Coyner for the proposition that DeRose only earned $300/hour ignores the fact that another court two years later awarded Mr. DeRose $400/hour for court time, see Shales v. General Chauf., Sales. & Hlprs. Local Union No. 330, 00 C 575, 2003 WL 22038596, *4 (N.D. Ill. Aug. 28, 2003), a rate which is $452/hour in present dollars.

[22] One of the only two rate comparison cases cited by the defense that comes within even four years of the present actually supports Plaintiffs' request. In 2003, lead counsel Greg Kulis in Stive was awarded $300/hour, which is the equivalent of $340 in 2007 dollars. While this is admittedly slightly less than the $365 and $350 sought by L&L Attorneys Jon Loevy and Mike Kanovitz, the evidence before the Court establishes that the market for legal services has increased far faster than inflation in the ensuing four years. Furthermore, attorneys are not all fungible, and with nothing but respect to our esteemed colleague Mr. Kulis, the fact is that L&L has demonstrated far more overall success.

with less experience and success than any of L&L's three lead lawyers is dismissed by
Defendants as a "mistake." See also Krumwiede v. Brighton Assoc., LLC, 05 C 3003, 2006 WL
2349985, *4 (N.D. Ill. Aug. 9, 2006) (actual hourly rate of eighth-year went from $330/hour in
2005 to $375/hour in 2006); Moffett v. American Coal Co., 06 CV 4082, 2007 WL 114011 (S.D.
Ill. Jan. 9, 2007) (awarding $380/hour in employment case litigated in Southern Illinois for a
lawyer six years more senior, but with less trial experience, than counsel in our case); O'Sullivan
v. City of Chicago, 484 F.Supp.2d 829 (N.D. Ill. 2007) (approving without objection by Chicago
a rate of $335/hour for an attorney admitted in 1997, three years after Mr. Kanovitz).[23]

The point is, Plaintiff is the only party citing the Court to current cases from the
presently-prevailing market. These more recent awards are consistent with the jump in the
market for legal services generally, in which *first-year associates* at the largest firms in Chicago
are now billing as high as $300 and even $400/hour. See Exhibit Q. Likewise, Brad Block's
Affidavit (which though undeniably self-interested, is sworn) confirms from his recent
experience in the private sector that litigators at the most expensive law firms with experience
comparable to L&L lawyers are now billing around $440 to $685/hour. See Exhibit R.

Defendants' attack on those statistics as "irrelevant" to the civil rights field is misplaced.
While obviously not dispositive, these figures nonetheless serve as informative benchmarks
showing that first-year salaries and partner rates are now roughly *double* what they were even as
recently as six or seven years ago, *i.e.*, the time when courts were making the awards relied upon

---

[23] As an aside, the cases cited by the defense hardly prove their point because after adjusting for
even general (non-legal services) inflation, the rates are not as low as Defendants seem to
assume: $425/hour (Flaxman); $375/hour (Stein); $350/hour (Grossman); and $340/hour (Kulis
and DeRose). Moreover, Defendants' focus on the most favorable examples it could find ignores
that are other examples that are higher. E.g., Spina, 2002 WL 1770010, *3-*6 ($350/hour for an
civil rights attorney with the same year of graduation as Mr. Kanovitz and Jon Loevy, which is
$395/hour in 2007 dollars); Johnny's IceHouse, Inc. v. Amateur Hockey Ass'n of Ill., 00 C 7363,
2001 WL 893840, *4-*5 (N.D. Ill. Aug. 7, 2001) (recognizing that lead counsel in civil rights
cases ranged from $300 to $325, which is $350 to $375/hour in 2007 dollars).

by the defense. Things change, and billing rates have recently increased exponentially, as opposed to a strictly linear fashion.[24]

Plaintiff acknowledges that the foregoing analysis assumes that L&L's awards should be near the top end of the market for such services, but Plaintiffs respectfully submit they have made such a showing. In addition to the extraordinary result achieved in this case, the three lead Plaintiffs' attorneys have a combined 68 years of experience as members of the bar, and they have built one of the most successful civil rights firms around. The firm now has thirteen lawyers devoted to civil rights, and has won more than $50 million in jury verdicts over the past ten years. This includes seven different civil rights cases with verdicts of $1 million or more.[25] Lead Plaintiffs' counsel have also won a combined nine out of their last eleven civil rights cases argued in the Seventh Circuit, and have affected all sorts of justice in the civil rights field. See Exhibits H through O.

Defendants dismiss as "self-promotion" the summation of L&L's accomplishments, and, frankly, no one is comfortable "bragging" about achievements. In fairness, however, L&L is entitled to justify their rates, particularly because this Court has had only a very limited opportunity to view L&L's work first-hand. "Self-promotion" or not, at the end of the day, L&L has successfully litigated more than 200 civil rights cases in federal court, and has amassed a record of success that stacks up favorably with virtually any civil rights firm in the country. See Exhibits H through O, and S.

---

[24] Defendants' reliance on Phil Beck's five year-old rate from Newsome illustrates this well. While Judge Plunkett limited him to $325/hour back in 2002 (compared to the $550 he requested), a mere five years later, top lawyers like Mr. Beck are now billing more than $1000/hour. See Exhibit 11. Thus, in only five years, the rates more than doubled.

[25] Defendants respond that three of those verdicts were subsequently remitted, but that only means that judges concluded that L&L won those trials "too big" relative to the actual facts. The fact is, all seven of those case, as well as many other L&L trial victories, could only be characterized as long-shots to win at all. See Exhibit H, Loevy Aff. ¶¶ 5-17 (describing difficult fact patterns).

### 1. Jon Loevy's Rate of $365/Hour Has Been Justified And Should Be Awarded

As set forth above, Jon Loevy was recently awarded $375/hour in the Dominguez case where he was lead counsel. Accounting for Mr. Kanovitz' greater role in the Lopez case, Loevy seeks $365/hour for time spent here.

In 40+ pages of arguments, the one thing to which Defendants do not even attempt to respond is Judge Holderman's holding four years ago that Jon Loevy "clearly could command an hourly market rate of $325 to $350. . ." Exhibit X, Garcia v. Chicago, No. 01 C 8945, 2003 WL 22175620, *2-*3 (N.D. Ill. Sept. 19, 2003) (Loevy's "ability belies his years of experience, and he certainly should not be held in a lock-step position based on his law school graduation year with regard to his hourly rate"). Adjusted for 2007 dollars, the United States Bureau of Labor Statistics calculator now equates Judge Holderman's assessment to $396/hour -- which is a bit more than was the case at the time Plaintiff filed his Petition, but in either event considerably more than the $365/hour sought here.

In response, Defendants would much prefer this Court follow the six year old decision in Medina v. City of Chicago, 00 C 1, 2001 WL 1104600 (N.D. Ill. Sept. 14, 2001). Defendants' reliance is entirely misplaced. In awarding Jon Loevy a low rate, Judge Kennelly expressly noted that L&L had failed to proffer competent evidence to support their rates, a scenario which doomed their requests. Id. at *5. However, the court went out of the way to note: "This is not to say that they might not be able to support higher rates, but only that they have not done so by their submissions in this case." Id. Six years later and more than a dozen successful Section 1983 trials later, Medina has far less persuasive force than Garcia's $396/hour assessment two years later, not to mention the $375/hour awarded this month in Dominguez.

Defendants also point to Robinson v. City of Harvey, yet another fee petition litigated between the same two firms. The most noteworthy fact about Robinson is that the judge who decided the fee petition had never met Plaintiffs' counsel, much less observed any of their work. This is because the case was transferred to Judge Plunkett after trial due to a conflict that arose

32

for Judge Lefkow. <u>Robinson</u>, 489 F.3d 864, 871-72 (Judge Plunkett "agreed that because he had not witnessed the events of the trial he did not properly appreciate the complexity of the case and the need for extensive trial preparation by Robinson's counsel"). Under the circumstances, Judge Plunkett's guesstimate about what L&L lawyers were worth is not nearly as useful as Judge Holderman and Shadur's first-hand assessments.[26]

### 2. Michael Kanovitz's Rate of $350/Hour Has Been Justified And Should Be Awarded

Aside from arguing that the $375/hour awarded last year in <u>Delgado</u> was a mistake, and dismissing the three-year old award of $350/hour to lead counsel in <u>Spina</u> ($395/hour after CPI inflation) as attributable to attorney McFadden's non-legal life experience, Defendants have nothing persuasive to add with respect to Mr. Kanovitz. He was lead counsel for the majority of this case, lead trial counsel, and the attorney most responsible for the extraordinary result achieved here after six years of difficult battling against a highly-motivated and aggressive defense. The results speak for itself and, coupled with the accomplishments summarized in his Affidavit, justify the rate of $350/hour.

In further support, Mr. Kanovitz stands on the discussion *supra* regarding current market rates for lead attorneys in civil rights cases. Even under the cases cited by the Defendants -- the very best they could muster -- lead counsel in civil rights cases was making $300-$325/hour in the late 1990s/early 2000s. This Court, for example, approved $325/hour in 2000. Given standard CPI (non-legal) inflation, the rate of $300/hour in 2000 equates to $362/hour in 2007

---

[26] Defense counsel went so far as to appeal the <u>Robinson</u> fee award (they lost, <u>see</u> 489 F.3d 864 at 871-72) and their client is *still* paying to litigate fees (for the appeal) to this day. Indeed, if the Court detected a pattern in terms of cases involving L&L and this particular defense firm going all the way rather than settling, the Court would be correct. Over the past decade, L&L has litigated more than 150 cases against the City of Chicago, and only seven have been forced all the way to trial as opposed to settling. Of those few that could not be resolved without a trial, more than half -- four, including this one -- were defended by the same lawyers from Ancel Glink, resulting in Plaintiff's verdicts of $1 million (for a broken nose in <u>Garcia</u>); $1.5 million (for a police shooting in Cabrini Green); $115,000 (for an excessive force case, pending fee petition to be adjudicated by Judge Zagel); as well as millions of dollars in attorneys' fees paid by their client, the City of Chicago.

dollars, more than what Mr. Kanovitz has requested, and almost exactly what the Court recently awarded him in Dominguez, a case where his role was more limited.

### 3. Arthur Loevy's Rate of $450/Hour Has Been Justified And Should Be Awarded

Arthur Loevy, the senior partner in the firm, has been a member of the Illinois bar for more than forty years. Though he was judicious in expending time on the case (all told, he is claiming only 224 hours over six years), he nonetheless played an important role, taking the most significant depositions and providing overall guidance. Mr. Loevy was recently awarded $450/hour in Dominguez, and the Court should follow Judge Shadur's lead.

Defendants try to characterize this rate as "extravagant" for an attorney of his experience, talents, and accomplishments, but the discussion above makes plain that whatever was the case in the past, the now-prevailing market for "grey-haired" attorneys easily exceeds this sum. Aside from Medina (for which, as pointed out above, L&L failed to make the required showing to justify their rates) and Robinson (for which Judge Plunkett had no familiarity whatsoever with L&L's lawyers) Defendants offer no reason to depart downward from what is now Arthur Loevy's most- recently adjudicated rate from Dominguez. That rate is warranted here as well.

### 4. Mark Reyes' Rate of $345 Hour Has Been Justified And Should Be Awarded

Mark Reyes' rate of $345/hour was not objected to by the Defendants. Given the overall contentiousness of this case, Plaintiff ventures to guess that this was due to oversight rather than assent, but the lack of rebuttal is what it is. Reyes' award, which mirrors the $345/hour he was recently awarded in Dominguez, is justified and should be approved.

### 5. The L&L Associates Rates (Rosenblatt, Antholt, and Ainsworth) Have Been Justified And Should Be Approved

Rosenblatt is an eighth-year attorney, Antholt and Ainsworth are fifth-years. However, as their Affidavits attest, all of their experience and litigation success exceeds many of their peers. See Exhibits H through O. Each has been personally responsible for dozens of federal civil rights cases, almost all of which have been resolved successfully. Id.

Defendants criticize their purported lack of trial experience, but these attorneys have collectively served as trial counsel for more than a half-dozen civil rights trials, id., not an insubstantial number. In fact, since the time Plaintiff filed his Petition with this Court, both Antholt and Ainsworth have won trials: just last month, Ms. Antholt (along with Mr. Kanovitz) won a $150,000 verdict in a Title VII sexual harassment case before Judge Castillo, and Mr. Ainsworth, acting as lead trial counsel, obtained a $525,000 verdict in state court on a malicious prosecution claim. See Exhibit 11.

Defendants also argue that Plaintiff makes no attempt to justify the rates sought, but the rates derive directly from the Laffey Matrix. Far from "irrelevant," the Matrix represents the rates that the United States stipulates as reasonable in fee-shifting cases. Unlike defense counsel in this case, the United States appreciates the efficiency in avoiding litigation on a case-by-case basis over what rates are reasonable under Section 1988. The Laffey Matrix has been widely adopted, and even adjusted upward in jurisdictions such as this one, where the cost of legal services is higher than in Washington D.C. While Defendants are correct that the Seventh Circuit has never addressed the Laffey Matrix, Plaintiff cited multiple judges in this District that have cited it for lawyer rates, and Plaintiff submits that this Court should consider it as well.

Plaintiff here requests the upper range of the actual (non-adjusted) Laffey rates, amounting to $290/hour for Rosenblatt, a former big firm lawyer who has been posting outstanding results for almost a decade, and $250/hour for the two fifth-year attorneys, Antholt and Ainsworth, both of whose credentials are equally impressive. These rates are considerably less than what Judge Kennelly awarded last year for premium civil rights work by seventh-year attorneys ($340/hour); sixth-years ($310/hour); and fifth-years ($275/hour). See Entertainment Software Ass'n v. Blagojevich, 05 C 4265, 2006 WL 3694851, *2-*3 (N.D. Ill. Aug. 9, 2006).

Considering that Defendants offer nothing in response as to what the market *presently bears*, Defendants have failed to justify a different conclusion.[27]

### 6. Kurt Feuer's Rates

Alone among Plaintiff's counsel, Attorney Feuer has an established billing rate. Defendants' Response fails to appreciate the significance of the fact that as a long-time former partner at Ross & Hardies, Mr. Feuer has numerous litigation clients who paid him the rate sought (adjusted for inflation) of $400/hour. People Who Care v. Rockford Bd. of Ed., 90 F.3d 1307, 1313 (7th Cir. 1996).

In response, Defendants point out that Mr. Feuer once had his rate adjudicated in a case involving a violation of the Visual Artists Rights Act (destruction of a statue) at $215/hour for work performed about a decade ago. Defendants also argue that Mr. Feuer's role in the Lopez litigation primarily involved trying to develop witnesses. Given his rather limited role, Plaintiff is willing to voluntarily reduce Mr. Feuer's request to $350/hour for this case only, which is far less than his former Ross & Hardies partners presently bill for comparable work, and should be approved.

### 7. Paralegal Rates

Plaintiff cited multiple recent cases awarding paralegals $100 to $125/hour (which, by the way, come disturbingly close to what Defendants propose to pay accomplished fifth-year lawyers). Defendants respond with a six-year old Seventh Circuit case approving $90/hour for

---

[27] In Plaintiff's view, Defendants' insistence that an accomplished ninth-year attorney should make $170/hour is so patently unreasonable under even any of the cases Defendants were able to locate that it calls Defendants' credibility into question. Ninth-year attorneys were making more than $170/hour ten years ago, to say nothing of a decade's worth of inflation. Compare Krumwiede v. Brighton Associates, L.L.C., 05 C 3003, 2006 WL 2349985, *4 (N.D.Ill. Aug. 9, 2006) (approving $175/hour for work by a legal assistant). Accordingly, Plaintiff respectfully submits that the Court should resist any temptation to "split the difference" between Defendants' unsupported overreaching and the prevailing Dominguez/Laffey/Entertainment Software scale.

paralegal time. In present value terms, that equates to exactly the $105/hour sought here. Judge Shadur likewise recently awarded $105/hour, and the amount is appropriate.[28]

**III.      With Limited Exceptions, Plaintiff's Costs Should Be Approved**

Plaintiff submits documentation for every expense at issue, plus an affidavit from L&L's bookkeeper averring that these receipts were all generated in the <u>Lopez</u> litigation. <u>See</u> Exhibit V. Even a quick thumb-through of the invoices/receipts (Exhibit W) confirms that the records were carefully maintained, and the costs should be awarded. <u>See</u> <u>Gyrion v. City of Chicago</u>, 454 F.Supp.2d 725, 726 (N.D.Ill. 2006) (relying on fact that "City has submitted a declaration from counsel affirming that all itemized expenses are accurate").

**A.      The City Is Judicially Estopped From Challenging The Sufficiency Of The Explanation For The Necessity Of Adequately-Documented Expenses**

Prior Plaintiff's successful appeal, the City filed its own Bill of Costs, which the Judge Der-Yeghiayan granted in full. <u>See</u> Exhibit 2. As the Court can see, the City included nowhere near the level of description/justification that it now argues this Court should require of Plaintiff. <u>Id.</u> ("Attachment B"). When the City was the party seeking costs in this case, entries such as "Metro KDR, Inc. -- rush delivery on 3/1/05 from Loevy & Loevy" and "Encore Lex Solution -- copies of documents and handmade tabs" and "copy fees from case status search at Daley Center" were all offered and accepted without further explanation to support the City's request for costs. <u>Id.</u>

In yet another example of a double-standard, the City now objects to comparable descriptions by Plaintiff as insufficient. These objections should be overruled. If lack of detail did not bar the City from collecting its own costs, then it cannot so operate now that the tables have turned. Under the doctrine of judicial estoppel, "[w]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply

---

[28] The City complains that several L&L paralegals have no formal paralegal certificates, but their Affidavits (Exhibit P) confirm their excellent educational qualifications, all of which amply qualify them to perform witness interviews and the like. Additionally, the fact that several are related to attorneys in the firm is not a disqualifying factor either; after all, four L&L attorneys are related to each other too, and that is no reason not to be compensated.

because his interests have changed, assume a contrary position." <u>Davis v. Wakelee</u>, 156 U.S. 680, 689 (1895); <u>Jarrard v. CDI Telecom., Inc.</u>, 408 F.3d 905 (7th Cir. 2005) (judicial estoppel prevents parties from "changing positions according to the exigencies of the moment").

Before the reversal of fortunes, the City claimed and received $25,491 in costs in this case. Exhibit 2. The City nevertheless argues to this Court that Plaintiff is entitled to not one penny more than $13,504.24. <u>See</u> City's Exhibits I & J (last page). The Court thus must sift through still more hypocritical and often overreaching objections by the City.

To make the Court's task as easy as possible, Plaintiff has withdrawn those entries where either (a) the City is correct, or (b) the question is close enough that it is not worth contesting. The remainder are reasonable, and should be awarded.

**B.      Plaintiff's Descriptions Are Sufficient**

Plaintiff's response to Defendants' objections to the requested reimbursements is attached hereto as Exhibit 15. <u>See</u> <u>also</u> Exhibits W & P (Affidavits). For the reasons stated therein, Defendants objections should be overruled.

<b>Conclusion</b>

For the foregoing reasons, Plaintiff respectfully requests that the Court approve his fee Petition and costs.

RESPECTFULLY SUBMITTED,


_____ /s Mike Kanovitz _____


Arthur Loevy
Mike Kanovitz
Jon Loevy
LOEVY & LOEVY
312 North May Street
Suite 100
Chicago, IL 60607
(312) 243-5900

## CERTIFICATE OF SERVICE

I, Michael Kanovitz, an attorney, certify that on August 28, 2007, I served this document by ECF electronic filing as to each party who is represented by counsel who uses electronic filing.

S/Michael Kanovitz